ASSOCIATED TRANSPORT, INC., et al., Plaintiffs, *v.* CITY OF SYRACUSE et al., Defendants.

Supreme Court, Equity Term, Onondaga County, November 21, 1949.

*John T. Deegan* for plaintiffs.

*Lyle W. Hornbeck, Corporation Counsel (Arthur M. Beach, George T. Driscoll* and *Dwight C. Dale* of counsel), for City of Syracuse and others, defendants.

*Leon A. Tarolli, Village Attorney (George R. Fearon* of counsel), for Village of Solvay and others, defendants.

BASTOW, J. The plaintiffs, intrastate and interstate motor carriers of freight, bring this action for an injunction permanently enjoining the defendants, City of Syracuse and its officials (hereinafter referred. to as " Syracuse ") and the defendants, Village of Solvay and its officials (hereinafter referred to as " Solvay ") from enforcing certain ordinances adopted by each municipality. The plaintiffs further seek a judgment declaring that said ordinances are unconstitutional, illegal and void.

The answer of Syracuse and the .amended answer of Solvay put in issue the material allegations of the complaint. Each municipality alleges that its ordinance or ordinances are legal and valid. In addition Solvay seeks the same affirmative relief against Syracuse as is demanded by the plaintiffs.

*The Ordinances*

There are three basic ordinances under attack by the plaintiffs — two enacted by Solvay and one by Syracuse.

On April 9, 1940, Solvay passed an ordinance in part as follows: " No vehicular traffic shall be permitted on Milton Avenue, Solvay, New York, wherein the gross weight of the Vehicle plus the load exceeds 5 tons or 10,000 pounds, said weight to be ascertained by computing the entire weight of the

truck, or in the event that said vehicle is a tractor trailer, then by computing the entire weight of the tractor and trailer plus load.''

On May 2, 1940, Solvay adopted a second ordinance identical with the above-quoted enactment except that vehicular traffic of the kind described was not permitted on Charles Avenue or Woods Road in the village.

The Syracuse ordinance under attack in this action was enacted on November 25, 1946, and consisted of an amendment to section 13 of the General Ordinances No. 694 adopted June 10, 1935, known as the Traffic Code as added May 10, 1937, and amended August 4, 1941.

Section 13, as amended in 1946, provided that '' drivers of vehicles shall not drive or operate any through-freight motor trucks on any of the public streets of this city '' except as thereinafter stated. The pertinent provision affected westbound through-freight motor trucks and provided as follows: '' West Bound: Thompson Road and City Line west on Erie Boulevard East and Erie Boulevard West to Milton Avenue; thence westerly on Milton Avenue to the City Line.''

It is found that the effect of the Solvay ordinance of April 9, 1940, and the Syracuse ordinance of November 25, 1946, was to prevent westbound through-freight motor trucks from proceeding further west than the west city line of Syracuse.

Two other Syracuse ordinances should be mentioned. On August 6, 1941, the portion of the Syracuse Traffic Code heretofore quoted was amended to read as follows: '' West Bound: Thompson Road and City Line, west on Erie Boulevard to West Genesee Street to State Fair Boulevard to City Line.''

This was a circuitous route that by-passed at least the greater part of the village of Solvay and led to Belle Isle Road which was some 3,750 feet west of the west village line of Solvay. This route was used for a short time and the ordinance enforced. Then a road in the vicinity of the airport was closed and the route could no longer be used.

Lastly, on February 16, 1949, Syracuse adopted another ordinance in connection with a general revision of the Traffic Code. This continued unchanged the routing of westbound through-freight motor traffic prescribed in the 1946 ordinance.

*Geography, Topography and Surrounding Conditions of Highway Routes*

The village of Solvay adjoins the city of Syracuse on the west. West Genesee Street in Syracuse commences at Clinton Square in the business section of the city and proceeds westerly

to the city line. At a point 3,797 feet or .72 of a mile from the city line on West Genesee Street the latter street crosses Erie Boulevard. It is at this point that the respective truck routes established by Syracuse and Solvay diverge.

The route prescribed by the Syracuse ordinance is over Erie Boulevard and Milton Avenue to the city line. The latter is a distance of 6,150 feet or 1.2 miles from the intersection of Erie Boulevard West and West Genesee Street. Portions of this route are shown in the photographs exhibits 101 to 107, inclusive.

The pavement on Erie Boulevard is 36 feet wide from West Genesee Street to a point 1,300 feet east of Willis Avenue and then widens some to Willis Avenue. From the latter avenue to Milton Avenue it is 40 feet — it then is reduced in width to 35 feet and widens to 50 feet at the west city line.

Erie Boulevard as it meets the grade at West Genesee Street runs northwesterly to a point of curve a distance of 3,908 feet with a rise in grade of .8 of a foot. From this point of curve to Milton Avenue a distance of 1,592 feet there is a total rise of 27.2 feet or an average of 2%.

If westbound truck traffic should travel this route as required by the Syracuse ordinance there would be three alternate routes it might proceed over after entering Solvay at the east village line.

The first route would be over Milton Avenue from the east village line a distance of 600 feet to Charles Avenue and thence in a southerly direction on Charles Avenue 4,400 feet or .83 of a mile to West Genesee Street as continued west of the city line.

The second route would be over Milton Avenue from the east village line a distance of 600 feet to Charles Avenue; thence in a southerly direction on Charles Avenue a distance of 2,450 feet and thence over Woods Road to Milton Avenue.

The third route would be over Milton Avenue from the east village line through the village to the west village line a distance of 9,050 feet; thence on Milton Avenue extended 3,750 feet to the Belle Isle Road and thence on the latter road 1,650 feet to Fairmount Corners where the route would rejoin the highway known as Touring Route No. 5.

These three streets within Solvay require some further description.

*Charles Avenue*

This street runs southerly from Milton Avenue a distance of 4,400 feet to West Genesee Street in the village where it joins

Touring Route No. 5 some 550 feet west of the west city line. Charles Avenue is a 24-foot macadam street for about 2,000 feet south of Milton Avenue. It then narrows to a 20-foot pavement for the remainder of the distance. The avenue is substantially level except for the southerly 545 feet where there is a rise of 22.15 feet or a 4% rise in the grade.

There are residences and a playground on this street. Portions of Charles Avenue are shown in the photographs exhibits 67 to 71, inclusive, and exhibits 108 to 111, inclusive.

It will not be necessary to further discuss the route over Charles Avenue for the reason that both the witnesses called by Solvay and Mr. Kavanaugh, the traffic engineer of Syracuse, who was called by and qualified as an expert for Syracuse, testified that Charles Avenue was not an adequate, safe route for travel by through trucks and trailer trucks operated by most of the plaintiffs. These vehicles have an average gross weight of 30,000 to 35,000 pounds and a net weight of 8,500 to 9,500 pounds.

*Woods Road*

To travel over this street in Solvay it would be necessary for westbound traffic to proceed over Charles Avenue from the point where the latter intersects Milton Avenue a distance of 2,450 feet and then make a right-angle turn into Woods Road. There are four 45-degree angle turns in Woods Road in its length of approximately one mile from Charles Avenue to Milton Avenue. These turns are shown in photographs, exhibits 5, 6, 12 and 13.

Woods Road is 20 to 24 feet wide. Portions of the street are shown in the photographs exhibits 3 to 16, inclusive, 23 and 24. The sidewalks along most of the street adjoin the paved road and in winter when the street is plowed, snow is cast upon the sidewalk and pedestrians use the roadway.

Located on this street in addition to numerous residences are two public schools, a fire house, a church, the village hall and the village park. Approximately 620 pupils attend the two public schools. St. Cecelia's church has 3,500 communicants. Throughout the year 80 to 100 small children go daily to the church for religious instruction; on Thursday of each week 350 children of high school age attend the church from 11:30 to 1:30 for religious instruction. The village park has three or four ball diamonds and on occasions as many as 8,000 to 10,000 people congregate in this park.

*Milton Avenue and Belle Isle Road*

Milton Avenue is the main street in Solvay and runs a distance of 9,050 feet from the east village line to the west village line. After leaving the village Milton Avenue continues a distance of 3,750 feet to the Belle Isle Road. The intersection of Milton Avenue and Belle Isle Road is 1,650 feet north of Fairmount Corners at which point the Belle Isle Road intersects Touring Route No. 5.

Milton Avenue within the village is substantially level and from the west village line to Belle Isle Road the highway was described as rolling. However, in the stretch of highway on Belle Isle Road from Milton Avenue to Fairmount Corners — a distance as stated of 1,650 feet — the following grades exist. In the first 700 feet there is a 2% rise in grade; in the next 200 feet an 8% rise; in the next 300 feet a 7% rise and in the last 430 feet a 3% rise in grade.

Milton Avenue is 50 feet wide from the east village line to Orchard Road; 45 feet, 3 inches wide from Orchard Road to Bridge Street; 38 feet, 3 inches wide from Bridge Street to a point about 250 feet west of Darrow Avenue; from the latter point to Case Street it is 24 feet wide and from the latter street to the west village line and continuing to Belle Isle Road the street is 20 feet wide.

Portions of Milton Avenue are shown in the photographs exhibits 42 to 66, inclusive, and 83 to 90, inclusive. Portions of Milton Avenue and Belle Isle Road are shown in photographs, exhibits 91 to 94, inclusive.

There are about 18 streets in the village running southerly from Milton Avenue. However, there are only two streets — Bridge Street and Boyd Avenue — that run in a northerly direction from Milton Avenue. Bridge Street, which starts at Milton Avenue, leads to the State Fair Grounds and the plant of Holcomb Steel Company.

The residential and business districts of Solvay are south of Milton Avenue. The north side of the avenue is occupied by manufacturing plants and a few places of business.

There are six large industries located on the north side of the street. Solvay Process Company employs about 3,500; it has three rotating shifts and one day shift. Approximately 3,000 people enter or leave this plant between four and six in the afternoon. Frazer and Jones Company employs about 300; Stanton Foundry Company has about 100 employees; Pass and Seymour Company has an average of 700 who work

from eight to five; Iroquois China Company employs 240. Lastly, as heretofore stated, the plant of Holcomb Steel Company is located north of Milton Avenue and employs 4,000 people. Practically all of the employees of these industries must cross Milton Avenue in going to and from work. The majority live in Solvay and travel by foot but many drive cars.

Exhibit 75, page 1, sets forth in detail the number of residences and places of business on this avenue as of December 11, 1946.

The tracks of the Auburn Branch of the New York Central run parallel to and on the north side of Milton Avenue. West of Bridge Street the north line of Milton Avenue is the south line of the New York Central right of way. In places Milton Avenue is from five to ten feet higher in elevation than the railroad tracks.

Bridge Street, as heretofore stated, runs in a northerly direction from Milton Avenue at a point about midway between the east and west village lines. Bridge Street is a direct route to the State Fair Grounds and is much used by motorists both from Solvay and communities west of Solvay to attend athletic events in the Coliseum during the winter months. Milton Avenue and Bridge Street are congested with traffic during the week of the State Fair.

*Lower Road to Camillus*

Late in the trial, evidence was received about a highway leading from the Belle Isle Road in a westerly direction a distance of three and three-quarter miles to the village of Camillus. This is a two-strip concrete road which parallels the New York Central tracks for less than half its length on the south side and then crosses the unguarded tracks at right angles. There are several curves in the road, one of which was described as a sharp or bad curve.

*West Genesee Street and Touring Route No. 5 to Fairmount Corners*

Consideration of West Genesee Street will be limited to that portion from the point where it intersects with Erie Boulevard westerly to the hamlet of Fairmount Corners. From Erie Boulevard and West Genesee Street it is a distance along the latter street of 3,797 feet or .72 of a mile to the west city line. From the latter point along West Genesee Street or Touring Route No. 5 to Fairmount Corners and the intersection of Belle Isle Road it is a distance of 12,500 feet or 2.36 miles.

The total distance from Erie Boulevard and West Genesee Street along the latter to Belle Isle Road at Fairmount Corners

is 16,297 feet or 3.08 miles. The total distance from the same intersection over Erie Boulevard and Milton Avenue to Belle Isle Road and thence to Fairmount Corners is 20,500 feet or 3.92 miles.

West Genesee Street from Erie Boulevard to the west city line is 99 feet in width of which 40 feet is paved for vehicular traffic. For a short distance on this street from Erie Boulevard to Fayette Street it is somewhat wider as it there joins with Hamilton Street and Erie Boulevard. The pavement is of asphalt.

From Erie Boulevard to Fayette Street there is a 5% rise in grade; Fayette Street to Lowell Avenue a 2% rise in grade; Lowell Avenue to Emerson Avenue a distance of 734 feet a 5% rise; Emerson Avenue to a point 183 feet west thereof a 3% rise; from that point to a point 232 feet west of Milton Avenue a 1% drop in grade; from that point to Willis Avenue a distance of 369 feet a 3% rise; Willis Avenue to Avery Avenue a distance of 600 feet a 6% rise in grade; Avery Avenue to a point 114 feet east of the city line a distance of 591 feet a 5% rise; from the latter point to the city line a 1% drop in grade.

From the westerly city line on West Genesee Street there is a four-lane State-maintained highway. This proceeds westerly and is a portion of the main east-west highway commonly known as Touring Route No. 5. It is officially designated, however, in section 340 of the Highway Law as a portion of Route 6.

At the point where the State highway commences at the west city line it is designated in the quoted section of the Highway Law as highway 5396. This latter highway extends westerly through the village of Solvay a distance of .69 of a mile. Highway 5396 extends westerly to a point where it meets highway 132 and the latter extends westerly to a point east of Fairmount Corners at which point highway 5016 commences. The latter extends westerly towards Camillus.

Portions of West Genesee Street within the city are shown in photographs, exhibits 33 to 37, inclusive, and 95 to 99 inclusive. Portions of West Genesee Street in the village of Solvay and Touring Route No. 5 are shown in photographs exhibits 25 to 32, inclusive, and 100.

There are six streets that intersect West Genesee Street and three cross streets terminate at West Genesee Street in the distance from Erie Boulevard to the west city line.

West Genesee Street is commercial from Erie Boulevard to Lowell Avenue. From the latter avenue to the west city line it

was formerly residential but the executive secretary of the city planning commission testified on cross-examination that there has been a substantial change; residences have become boarding houses, tourist homes or two or three-family houses; other residences have been converted to doctors' offices and funeral parlors and other business places have been established.

Exhibit 75, page 2, gives a detailed statement of the occupancy of structures on this street as of December 11, 1946.

On West Genesee Street there are a church and a library. An occupancy map shows in detail this street and the adjoining territory. There are several churches and schools in an area of six or seven blocks from West Genesee Street.

The foregoing is a comparatively brief statement of the facts. The trial record ran to nearly 2,000 pages and it obviously would be impossible within reasonable limits to summarize all of the evidence adduced upon the trial.

We may start out with the undisputed fact that the plaintiffs are through truckers holding certificates of public convenience and necessity from the Interstate Commerce Commission or the Public Service Commission or both. The majority of the certificates designate Touring Route No. 5 (designated as " NY5 ") as the required route to be traveled in proceeding from Albany to Rochester and the west.

There further can be no dispute that the combination of the ordinances of Syracuse and Solvay — if enforcement is permitted — prevents any westbound through-truck traffic of the kind described in the ordinances from proceeding further west than the west line of Syracuse.

Upon the appeal to the Appellate Division from certain orders it was said that on the trial " the issues will be, at least, the reasonableness and necessity for the ordinances of Syracuse and Solvay, and the situation in which plaintiffs will be left if either or both ordinances are held valid." (*Associated Transport, Inc.*, v. *City of Syracuse*, 274 App. Div. 565, 568.)

Turning first to the situation that confronted the village Board of Solvay prior to the adoption of the ordinances in April, 1940, it appears from the testimony of the then village officials that they were acquainted with the facts and that the board of trustees made determinations of facts based on their personal knowledge and reports received from other village officials with respect to Milton Avenue, Charles Avenue and Woods Road.

It is not necessary, however, to rely upon the testimony of present or former village officials as to the making of these determinations of facts. They are set forth in the preambles of the ordinances.

In considering these preambles they may be compared with the preamble to a statute. It has been said that such a preamble frequently contains recitals which illuminate the purpose and intent of the enactment. In fact, it is said to be the key which opens the minds of the lawmakers as to the mischiefs which are intended to be remedied by the statute. (McKinney's Cons. Laws of N. Y., Book 1 Statutes [1942 ed.], § 122.)

The preamble to the Solvay ordinance of April 9, 1940, relating to Milton Avenue is as follows:

" Whereas, Milton Avenue is maintained solely at Village expense; and

" Whereas the Village Board has been advised and from its own observation has ascertained that said Milton Avenue is rapidly deteriorating; and

" Whereas said deterioration is caused by the operation of heavy transport trucks which are utilizing our Village Streets as a part of the main highway across the State of New York; and

" Whereas Milton Avenue will have to be repaved shortly unless such heavy traffic is diverted, and said repaving will cost the taxpayers and citizens of the Village of Solvay over $100,000.00; and

" Whereas the Village administration has heretofore adopted a policy of economy and has rigorously adhered to the pay-as-you-go plan; and

" Whereas practically all of the trucks passing through Syracuse towards the west and entering Syracuse from the west and travelling to and from the Atlantic seaboard and the middle west are now using Milton Avenue; and

" Whereas this street was never designed nor constructed to accommodate the heavy vehicles which now use the street nor the extraordinary heavy traffic flow under which the street is now being subjected; and

" Whereas Milton Avenue is very narrow and many of the vehicles utilizing said street are extraordinarily wide and said conditions cause a traffic hazard which imperils the life and limb and property of the people of the community;

" And it being determined that for the preservation of good order, peace, health, safety and the welfare of the inhabitants of the Village of Solvay and the protection and security of their

property that trucks, trailer trucks and their loads or cargo, exceeding five tons in weight, should be prohibited from using Milton Avenue from the easterly to the westerly boundary of the Village.''

The preamble to the Solvay ordinance of May 2, 1940, relating to Charles Avenue and Woods Road reads as follows:

'' Whereas Woods Road, sometimes known as Chemung Street, and Charles Avenue are streets located in the Village of Solvay and are maintained solely and exclusively at the expense of the Village of Solvay; and

'' Whereas the Board of Trustees has been advised and from its own observation has ascertained that the pavement on said Charles Avenue is rapidly deteriorating; and

'' Whereas the said deterioration is caused by the operation of heavy transport trucks which are utilizing Charles Avenue as part of the main highway across the State of New York, and

'' Whereas the said Charles Avenue will have to be repaved shortly unless such heavy traffic is diverted, and the said repairing will cost the taxpayers and citizens of the Village of Solvay a large sum of money, and

'' Whereas a large number of trucks passing through the City of Syracuse towards the west and entering the City of Syracuse from the west and traveling to and from the Atlantic Seaboard and the Middle West are now using the said Charles Avenue and Woods Road, and

'' Whereas the said Charles Avenue and Woods Road were not designed or constructed to accommodate vehicles of the gross weight of five tons or over, and

'' Whereas the said Charles Avenue and Woods Road are very narrow Streets and many of the vehicles traversing them are extraordinarily wide, and said conditions cause a traffic hazard which imperils the life and limb and property of the people of the community and

'' Whereas there is located on both said Charles Avenue and Woods Road a number of public playgrounds upon and about which, and from time to time, there are upwards of 200 children using the same, for play, and access to which is almost exclusively from the said Charles Avenue and Woods Road and

'' Whereas the said Woods Road and Charles Avenue are in a predominantly residential district and in a highly congested area and

'' Whereas there are located on Woods Road two grade schools and that a great number of children use the said streets during the school year in going to and from said school and

"Whereas the said Woods Road has been recently reconstructed and repaved and its construction was not designed for trucks or vehicles exceeding in weight 5 tons gross, and it being determined for the preservation of good order, peace, health, safety and welfare of the inhabitants of the Village of Solvay, and the protection and security of their property that trucks and trailer trucks, and their loads or cargo exceeding five tons in weight, should be prohibited from using said Woods Road and Charles Avenue in either direction."

Before considering the ordinance relating to Milton Avenue, it may be well to dispose of the second ordinance relating to Charles Avenue and Woods Road. Upon all the evidence this latter ordinance is found to have been reasonable and necessary and its enactment was not arbitrary or capricious. The conclusion is reached that by reason of construction, location, course and surrounding conditions neither of these streets was a suitable, safe or adequate highway for use by vehicles described in the ordinance.

Several witnesses called by Solvay expressed this opinion. In addition, as heretofore stated, Syracuse called as a witness its city traffic engineer. In answer to a hypothetical question, the witness upon direct examination expressed the opinion that Charles Avenue was not an adequate, safe route for through tractor-trailers of the type and size operated by the plaintiffs.

Syracuse made no particular effort upon the trial to rebut the evidence of Solvay that Woods Road was not safe and suitable for this type of vehicular traffic. Any attempt to route a substantial number of large tractor-trailers over this 24-foot street with its four sharp turns and considering the means of ingress and egress therefrom would result in traffic chaos with the risk of serious personal or property damage to other users of the street.

Considering next the Solvay ordinance of April 9, 1940, prohibiting through tractor-trailer traffic on Milton Avenue, in addition to the factual statements contained in the preamble it appears from the testimony that the trustees at the time knew and took into consideration the facts heretofore stated including the several industries on the north side of Milton Avenue, the thousands of persons who were employed by these companies and that many of these employees twice a day or more were required to cross Milton Avenue either on foot or in automobiles.

In addition the board knew and took into consideration the fact there was another route through the village that these tractor-trailers could travel.

In this connection it appears to be undisputed that for nearly three quarters of a century the Genesee Turnpike — running from Albany on the east to Buffalo on the west — entered Syracuse on East Genesee Street proceeded to Clinton Square and westerly over West Genesee Street to the west city line and thence westerly to Fairmount Corners, Camillus, Auburn and the west. A portion of this highway passed through the village of Solvay for a distance of nearly a mile from the west city line of Syracuse.

In other words the 1940 ordinances of Solvay while barring trucks and tractor-trailers of the size described from using Milton Avenue did not — as intimated by Syracuse — bar such traffic entirely from its village. It appears clearly from the evidence that (a) trucks of the prohibited size were permitted to use Milton Avenue for the transaction of business thereon and (b) no attempt was made to bar any truck traffic from passing through the village on West Genesee Street. It might be added at this point that the latter route through Solvay was practically conceded by all parties to be an adequate, safe and suitable route through the village.

Upon all the evidence it is found that the adoption on April 9, 1940, by Solvay of the ordinance prohibiting truck traffic as described therein from using Milton Avenue was reasonable and necessary and was not an arbitrary or capricious enactment.

It is the contention of Syracuse, however, that regardless of the reasonableness of the Solvay ordinance in 1940, it became unreasonable on the adoption by Syracuse of the 1946 ordinance. It is argued by Syracuse that although Solvay may direct or divert truck traffic once therein, it may not bar traffic from coming into its limits at the point where such traffic is required to enter by the ordinance of Syracuse.

To emphasize this argument Syracuse points to the fact that it accepts all eastbound truck traffic coming in from Solvay on West Genesee Street and has never attempted by ordinance or otherwise to prevent such entry.

To sustain its contention Syracuse cites a 1930 opinion of the Attorney-General (1930 Atty. Gen. 439). Factually, the problem there presented was entirely different than the one before us. In the course of his opinion, however, the Attorney-General did state that under section 90 of the Vehicle and

Traffic Law a municipality might lawfully designate highways from which heavy trucks should be excluded but in such case the village had the duty to provide an alternative route which was adequate, safe and suitable for otherwise it would be within the power of a village to bar such traffic entirely.

This opinion does not seem to have any bearing upon the instant case. There is no contention that Solvay has excluded truck traffic from entering its borders without furnishing an alternative route. On the contrary it permits both east and westbound traffic of all descriptions to pass through the village on West Genesee Street — the highway that was used before motor propelled vehicles were invented.

Syracuse also points to subdivision 1 of section 90 of the Vehicle and Traffic Law. This provides as follows: " The legislative body of a city, village, town of the first class or town of the second class having a population in excess of twenty-five thousand or any municipal officer, board or body designated by it, is hereby authorized to designate highways, respectively, in such city, or village, or such town outside of any villages therein, in which vehicles shall proceed in one direction only, or from which heavy trucks shall be excluded. Such designation shall not be construed to prevent deliveries of merchandise or other property along such highways. Highways so designated shall be so marked at all intersections by conspicuous signs which shall be visible during the hours in which such designation is to be observed. No state highway shall be thus designated without the approval of the state traffic commission."

This statute was amended in 1945 (L. 1945, ch. 455) but substantially the same provision was in effect in 1940. This enactment was apparently the authority under which both Solvay and Syracuse adopted the ordinances in question.

It appears that the respective rights of adjoining municipalities under this statutory provision has not been passed upon by any court. In 1933 the Attorney-General in an informal communication wrote to one Asher Cohen and discussed the Syracuse-Solvay traffic situation. (48 N. Y. St. Dept. Rep. 827.) It appeared that the Mayor of Syracuse at that time had ordered heavy truck traffic so routed that it passed through the entire length of the main street of Solvay. Informally and unofficially Mr. Cohen was informed that the action was lawful and that Solvay had the same right as the Mayor of Syracuse.

Lastly, Syracuse contends that its ordinance of November 25, 1946, routing westbound trucks on Erie Boulevard and Milton Avenue to the west city line was reasonable and valid. It takes the position that having provided a safe and suitable route to its west city line it owed and owes plaintiffs no other obligation.

In its answer, however, Syracuse alleged that Charles Avenue, Woods Road and Milton Avenue are each adequate, safe and suitable for westbound through-freight motor trucks. Upon the trial Syracuse devoted considerable time to Charles Avenue. Near the end of the trial, as heretofore stated, Syracuse called its city traffic engineer and proved by him that Charles Avenue was not a safe and suitable route. Next, Syracuse made no substantial attempt to prove that Woods Road was a safe and suitable route.

The city traffic engineer was next asked by Syracuse to express an opinion as to the adequacy and safety of the route over Milton Avenue from the east village line to Belle Isle Road and thence southerly to Touring Route No. 5. He expressed the opinion that this was an adequate truck route and safe with the exception of the 7% rise in grade on Belle Isle Road.

Syracuse had thus proved by its own expert that one route through Solvay was inadequate and unsafe; had offered no substantial proof as to the second route and had proved that the third route was not safe in its entirety.

These opinions were expressed by a city official who was present at a conference of Syracuse and Solvay officials — to which reference will hereafter be made — held prior to the adoption of the 1946 ordinance by Syracuse.

On the last day of the trial this witness was recalled and expressed the opinion that another route heretofore described as the lower road to Camillus was a safe and adequate route. During the lengthy trial practically no evidence had been brought out about this route. Upon all the testimony, including the facts brought out upon cross-examination of the witness, it is found that this route from Belle Isle Road to Camillus is not a safe and adequate route for through truck traffic.

Passing next to the facts surrounding the passage of the Syracuse ordinance on November 25, 1946. The ordinance was introduced by a councilman who from 1944 to 1947 represented the district which includes West Genesee Street from Erie Boulevard to the west city line. He testified the subject was discussed several times in committee meetings and it was

decided to send the trucks out Erie Boulevard and Solvay could "take them in somewhere, if not at Milton Avenue, then some other point they decided to use as a truck route through their community."

Further light is shed upon the adoption of the Syracuse ordinance by the testimony of the Solvay village clerk, who attended a meeting a short time prior to November 25, 1946, in the office of the Mayor of Syracuse to discuss the routing of trucks. Several city officials were present.

The witness testified without refutation that after various discussions the Mayor of Syracuse said " well, we are getting sick and tired of this, and the tail is wagging the dog and we aren't going to have it any more and we are going to send our trucks up Erie Boulevard and dump them at Solvay's door." The Mayor then said that Syracuse was going to pass the ordinance. A short time later the ordinance was passed.

Twelve days before the ordinance was adopted the Mayor of Solvay sent a letter to the Mayor of Syracuse calling the latter's attention to the Solvay ordinance and expressing the intent to enforce the ordinance if Syracuse routed traffic to Milton Avenue.

It was stated by the Appellate Division in this action (274 App. Div. 565, 568, *supra*) that the rule was recognized that, as to intrastate motor-freight carriers, the Legislature had accorded to municipalities the right to exclude such motor traffic from specific streets and that it was not imposing an undue burden on interstate commerce for a municipality, similarly, to exclude such motor freight traffic from a given street or streets. It was further stated, however, that " such exclusionary ordinances cannot be adopted arbitrarily or capriciously, but must have some basis of necessity, and usually requires the affording of another route reasonably adequate and useful."

The power and duty of courts generally to determine the reasonableness of ordinances as a judicial question have been stated as follows: " In considering the relationship of the judicial department to the legislative acts of a municipal corporation,— that is, the ordinances passed by the municipal legislative body,— it must constantly be kept in mind that the courts cannot set aside ordinances unless they are unconstitutional, ultra vires, and, under certain conditions, unreasonable, and cannot interfere with municipal ordinances which are reasonable and not in violation of the Constitution. Since

the unreasonableness of ordinances may, however, be a ground for their invalidation under appropriate circumstances, it is well settled that ordinances passed under general or implied grants of power must be found by the courts to be reasonable or they will be held to be void, for in such cases the reasonableness of ordinances is a judicial question which may be determined by the courts." (37 Am. Jur., Municipal Corporations, § 172.)

And upon the subject of a determination of reasonableness or unreasonableness of a municipal ordinance it has been said: " Viewing the question broadly, it has been held that the test of reasonableness of a municipal ordinance is that it shall in some degree tend to effect the accomplishment of the objects for which the municipal corporation was created and its power conferred, and shall not be in contravention of common right. If an ordinance is found to be partial and unequal in its operation as between different classes; if it is manifestly unjust; if it discloses bad faith; if it involves such oppressive or gratuitous interference with the rights of the citizen as can find no justification in the minds of reasonable men, the court might well say that the legislature never intended to give authority to make such rules; they are unreasonable and ultra vires." (37 Am. Jur., Municipal Corporations, § 173.)

While a city has plenary power over streets, such power may not be exercised arbitrarily, capriciously, or in bad faith. (*City of Norton* v. *Lowden,* 84 F. 2d 663, 665.)

Moreover, it is to be remembered that the use of streets is designed for the public at large, as distinguished from the legal entity known as the city, or municipal corporation. Whatever rights the city may have over its streets, by virtue of constitution or statutes, its powers are essentially those of a trustee for the benefit of the *cestui que trust* (the public), liberally construed for its benefit, strictly construed to its detriment. (1 McQuillan on Municipal Corporations [2d ed. rev.], §§ 246, 248.)

In *People* v. *Kerr* (27 N. Y. 188, 198–199) it was said: " The city of New York takes and holds the fee of the streets which have been opened under the statute referred to, in trust, that they should be kept open and used as streets, and for that only. This is a trust for the benefit of the public, not of the adjacent proprietors alone, nor of the inhabitants or citizens of New York alone, but of the whole people. The whole people have the same rights in the highway uses of such a public street as the inhabitants of the city or the owners of adjacent land."

And in *City of New York* v. *Rice* (198 N. Y. 124, 128) the court said: " The ownership by the city of the fee of the land in the streets is impressed with a trust to keep the same open and for use as such. The trust is *publici juris,* that is for the whole People of the state, and is under the absolute control of the legislature; in which body, as representing the People, is vested power to govern and to regulate the use of the streets. There is no right in the city to use its property therein, as it might corporate property, nor otherwise than as the legislature may authorize for some public use, or benefit."

The delegation of authority to certain municipalities by the Legislature as provided in subdivision 1 of section 90 of the Vehicle and Traffic Law should be considered in the light of the foregoing statements.

It is impossible for this court to find that Syracuse has fully performed its duties to the plaintiffs or to Solvay if it enacted an ordinance which routed through truck traffic to its boundaries without regard to the safety and adequacy of the route beyond such boundary.

In the light of the facts in this case it would be unrealistic for a court of equity to determine that the Legislature intended that one municipality never and under no circumstances could by proper ordinance prevent heavy truck traffic from entering its boundaries at a given point because an adjoining munici-pality had determined that such point was the required place of departure from its confines.

To say — as Syracuse does in this case — that a municipality may only designate highways therein from which heavy trucks shall be excluded *after* such vehicles have entered the munici-pality requires reading into the statutory provision something that is not contained therein.

To make such a hard and fast rule of law would entirely ignore the statements of our courts that streets are a public trust for use not only by the people of the municipality but of the whole State. Such a rule would open wide the door for municipal legislative bodies seeking favor with their constitu-ents to route heavy truck traffic in a manner most satisfactory to local residents and with a total disregard of the safety of life, limb and property after the traffic had reached the bound-ary of an adjoining municipality.

Equity will not allow itself to be outwitted or cheated, or to be frustrated or lost in mazes; it will go to lengths requisite to achieve results. It will penetrate the form and expose the

substance. It discards the pretenses and deals with the realities. Among equity's manifold weapons is the power to adopt its relief to the exigencies of the case. (*Leifer* v. *Murphy,* 149 Misc. 455, 459.)

Prior to determining whether the 1946 Syracuse ordinance (1) was reasonable or unreasonable; (2) afforded another route reasonably adequate and useful and (3) was adopted arbitrarily or capriciously the following findings are made:

1. Prior to the adoption of the 1946 ordinance the common council and Mayor of Syracuse knew that since 1940 there had been in force ordinances of Solvay prohibiting through trucks over five tons in weight traveling over Milton Avenue, Charles Avenue and Woods Road in Solvay.

2. That Milton Avenue, Charles Avenue and Woods Road in the village of Solvay were not safe, suitable and adequate routes for through tractor-trailer trucks.

3. That assuming through tractor-trailer trucks could safely go over Milton Avenue in Solvay it was not safe for said trucks (a) to travel over Belle Isle Road from Milton Avenue to West Genesee Street at Fairmount Corners or (b) to travel over the so-called " lower road " to Camillus.

4. That assuming through tractor-trailer trucks could safely go over Milton Avenue and thence over Belle Isle Road to West Genesee Street at Fairmount Corners the plaintiffs and other truckers similarly situated would be deprived from using State highway Touring Route No. 5 from the west Syracuse line to Fairmount Corners, a distance of 2.36 miles.

5. That assuming through tractor-trailer trucks could safely go over Milton Avenue and thence over the so-called " lower road " to Camillus the plaintiffs and other truckers similarly situated would be deprived from using State-highway Touring Route No. 5 from the west Syracuse line to Camillus, a distance of about 6 miles.

6. That prior to the adoption of the Syracuse ordinance no formal factual determination was made by the common council of Syracuse but the subject was discussed in certain committee meetings and it was decided to send the trucks described in the ordinance out Erie Boulevard to the east village line of Solvay and the latter could " take them in somewhere, if not at Milton Avenue, then some other point they decided to use as a truck route through their community."

7. That no other safe, suitable or adequate route existed for use by westbound through tractor-trailer trucks entering Solvay

at the east village line on Milton Avenue except by traveling over Milton Avenue, Charles Avenue and Woods Road or a combination of these streets.

8. That a short time before the adoption of the Syracuse ordinance a meeting was held at the office of the Mayor of Syracuse, at which were present officials of Syracuse and Solvay; that at the meeting the Mayor said Syracuse was going to pass the ordinance and in words or substance stated that the westbound through tractor-trailer trucks would be sent up Erie Boulevard and " dumped at Solvay's door ".

In the view this court takes of the case it becomes unnecessary to pass upon the safety and suitability of westbound through trucks using West Genesee Street from Erie Boulevard to the west city line.

It is to be remembered that section 90 of the Vehicle and Traffic Law authorizes certain municipalities to designate highways from which heavy trucks shall be excluded and to mark said highways. The Syracuse ordinance — unlike the Solvay ordinances — excludes such traffic from all public streets of the city except those on the route designated. It does not, as authorized by the statute, specify or designate streets from which heavy trucks shall be excluded.

The question now under consideration is the validity of the Syracuse ordinance. If, everything considered, this ordinance is found to be invalid the court should not be called upon to pass upon the safety and adequacy of any one or two or more of all the streets from which Syracuse has excluded westbound through truck traffic.

If Syracuse had passed an ordinance excluding such traffic from West Genesee Street the safety and suitability of the route could have been considered in passing upon the ordinance. Instead, as pointed out, Syracuse chose to establish a so-called truck route.

Parenthetically, the court has some doubt as to the validity of the Syracuse ordinance in its present form in view of the clear provisions of subdivision 1 of section 90 of the Vehicle and Traffic Law, and the prohibition contained in subdivision 5 of the same section. No municipality has power to make any law affecting public highways which contravenes the policy of the State touching such control and use. Streets are for the public use, but do not exist for the use of the municipality in which they are situated alone or its inhabitants. (4 McQuillan on Municipal Corporations [2d ed., rev.], § 1415.) The court

finds it unnecessary, however, to pass upon this question. Upon this subject, however, see subdivision 32 of section 20 of the General City Law, as added by chapter 874 of the Laws of 1948, the legislative statement of purpose and intent and the Governor's memorandum (April 12, 1948) on approving the enactment.

The conclusion that the safety and suitability of West Genesee Street is not before the court at this time is fortified by the fact that upon the trial Solvay offered proof of an alternative route that would permit the vehicles in question to proceed over Erie Boulevard and Milton Avenue — as provided in the Syracuse ordinance — to a point 170 feet east of the west city line.

At that point Avery Avenue runs in a substantially southerly direction a distance of 3,650 feet to West Genesee Street and intersects the latter street at a point one block east of the west city line on West Genesee Street. Avery Avenue is 100 feet wide and the pavement is 36 feet wide. It is substantially level with a rise in grade of about 2% in 3,650 feet.

Solvay contends that this is a safe and suitable route that would eliminate truck traffic from practically all of West Genesee Street and at the same time would permit the use of all but 170 feet of the route now laid out by Syracuse.

In any event the court should not be called upon to decide which street or streets of the many excluded by the Syracuse ordinance are safe and suitable for heavy truck traffic. The court should not substitute its opinion for that of the municipal legislative body. The question before the court is the reasonableness of the Syracuse ordinance and this question involves inquiry into whether or not it is arbitrary or capricious.

Upon the foregoing specific findings and upon all the evidence the conclusion is reached that the action of the City of Syracuse in adopting on November 25, 1946, the ordinance with respect to through-freight motor routes was unreasonable, arbitrary and capricious, and therefore null and void, insofar as it purported to prevent the driving or operation of any through-freight motor trucks on any public streets of the city of Syracuse westbound except from Erie Boulevard West to Milton Avenue and thence westerly on Milton Avenue to the city line.

Upon the trial Syracuse offered in evidence exhibits 81, 82, 113 and 114 upon which decision was reserved. The objections of Solvay to the admission of these exhibits are sustained with exceptions to Syracuse.

Similarly, Solvay offered in evidence exhibits 146, 149, 151 and 152 to which Syracuse objected. The objections are sustained with exceptions to Solvay.

The plaintiffs are entitled to a permanent injunction enjoining the defendants, the City of Syracuse and the officials thereof named as defendants, from enforcing so much of section 13 of General Ordinance No. 694 of the city of Syracuse, as amended by the common council on November 25, 1946, as purports to prevent the driving or operation of any through-freight motor trucks on any public streets of the city of Syracuse westbound except from Erie Boulevard West to Milton Avenue and thence westerly on Milton Avenue to the city line.

The plaintiffs and the Village of Solvay are entitled to enter a judgment which shall decide, determine and declare that so much of section 13 of General Ordinance 694 of the city of Syracuse, as amended by the common council on November 25, 1946, as prohibits or attempts to prohibit drivers of vehicles from driving or operating any through-freight motor trucks on any public streets of the city of Syracuse westbound except west on Erie Boulevard West to Milton Avenue and thence westerly on Milton Avenue to the city line is illegal, null and void and its enactment by the City of Syracuse is without validity, force and effect, with costs to the plaintiffs and defendant, Village of Solvay against the City of Syracuse.

The defendants, Village of Solvay and the officials thereof named as defendants, are entitled to a judgment that the plaintiffs' complaint as to them be dismissed, without costs.

In accordance with the stipulation made by the attorneys for the respective parties, proposed findings of fact and conclusions of law may be submitted by any party upon the rendering of this decision. If any party desires to act upon the stipulation the proposed findings and conclusions are to be submitted within ten days.