Henry W. Lengyel, J.
This is a claim for the appropriation of a portion of claimant’s land pursuant to section 30 of the Highway Law.
Claimant was the reputed owner of subject property hy reason of a deed dated January 10, 1966, from Kenneth T. Newcomb, grantor. The claimant originally entered into an option to purchase two parcels of land from Mr. Newbomb for the aggregate purchase price of $85,000. Said option was dated March 27, 1965. On September 9, 1965, claimant entered into a contract to purchase subject property and $55,000 of said $85,000 was allocated as the purchase price for said parcel. The aforesaid deed carried $60.50 in Federal revenue stamps which are an indication of the $55,000 purchase price. Said property was located in an area zoned H-2 Highway Business and in 1965 was assessed for $7,000. The local equalization rate was 26%.
*200 Subject property was located on the north side of U.S. Route 6 (also known as U.S. Route 202) in the Town of Southeast. The west boundary line of said property was adjacent to an access ramp connecting Route 6 to Route 22 which in turn connected with Interstate Route 87. Subject location was approximately one quarter of a mile north of a major interchange between Interstate Route No. 87 for north and south bound traffic and Interstate Route No. 84 for east and west bound traffic. It had 564.16± feet frontage on the north side of U.S. Route 6, which was a four-lane divided highway in this location. It contained 44,729± square feet. The site was generally level and at highway grade. It rose in elevation from the northwest corner to the southeast frontage approximately 4% on the average. The land was sandy loam and the drainage was generally good.
Subject property was improved with two buildings. The principal structure was a one-story, cement-block building, which had previously been occupied by a major oil company as a gasoline service station. Although only about 20 years of age, it was in fair to poor condition.
Subject property was located in a district designated H-2, Highway Business, under the zoning ordinance of the Town of Southeast. (See Exhibit “ C ”.) There was a sharp issue between the parties relative to the effect of the zoning ordinance on the before highest and best use of the property. The State assigned a before highest and best use of gasoline service station. The claimant assigned a dual highest and best use: (1) gasoline service station and (2) a general highway commercial and/or retail use, consonant with the applicable zoning. The State expert, a qualified professional engineer and land surveyor, was of the opinion that, because of the shape and size of subject property and the existing zoning, only one structure could be erected on the property. The pertinent zoning ordinances, according to this witness, were sections 3.3, 3.9, 10.2, 10.3 and 10.4. Particular weight was assigned to section 10.3, which read ‘ ‘ Each lot shall have a minimum area of 20,000 square feet, shall be such shape that a square with 100 feet on each side will fit on the lot and shall have a frontage of 100 feet or more on the street Although we have accepted the claimant’s area of 44,729± square feet, we note that the State’s area was 43,299± square feet. Obviously, two lots of at least 20,000 square feet could be carved out of subject property. A building could be constructed on each lot in conf ormity with the street setback requirement of 35 feet, side and rear line setback requirement of 15 feet and the building distance requirement *201 of 25 feet. However, because of the shape of subject property, only one 100-foot square would fit within the property boundary lines. The State, therefore, took the position that subject property, 11 could not be divided and developed as two parcels because the configuration of the property would not permit more than one parcel, compatible with Article 10, Section 10.3 of the Zoning Ordinance ”. Claimant’s expert was the building and zoning inspector of the Town of Southeast. He stated that, as there was more than 40,000 square feet in subject parcel and as setback, distance, height, and area coverage requirements could be met, a single owner would be permitted to construct two buildings on subject property. This witness had been the Building and Zoning Inspector of said town for several years, a position he still occupied at the date of trial and, under section 20.1 of Exhibit ‘ ‘ C ”, was responsible for the enforcement of said ordinance. We agree with both witnesses’ interpretation of these zoning ordinances. In other words, the claimant could not have subdivided the property into two parcels and sold one off to a gas station operator and the other to a commercial venture such as a retail drive-in restaurant or a bank. However, the claimant could have developed a gas station site and a general commercial site on subject property. It then could have operated both sites as one project; or, it could have leased the whole site to one operator; or, it could have leased each site to a different operator; or, it could have sold the whole property as one integrated parcel. However, under the zoning ordinance, the east and west portions of the property were indissolubly wedded and could not be developed and subdivided in the normal understanding of such real estate procedure. The claimant’s appraiser obviously was considering the normal subdivision procedure. To that extent, we consider his appraisal approach to have been incorrect. However, we do agree with a dual highest and best use before the appropriation. We believe the lack of development and subdivision flexibility required additional downward adjustments in the value of the easterly lands.
The highest and best use of subject property before the appropriation was a single ownership dual use of gasoline service station for the west 175± feet of frontage and general highway commercial use of the east 389± feet of frontage. The highest and best use of subject property after the appropriation was a limited general highway commercial use consonant with the existing zoning. The appropriation destroyed the before gasoline service station use.
*202 Subject proceeding appropriated a strip of land, 1 foot wide and 300 feet long, in fee without access along the southwesterly boundary line of claimant’s property. A fence was constructed along the line of said appropriation.
The State appraiser prepared two complete appraisals. His first appraisal (Exhibit “ L ”) was 61 pages long and his second appraisal (Exhibit “ K ”) was 66 pages long. The second appraisal was the filed appraisal. Although the first appraisal bears a State exhibit letter, it was utilized by the claimant and was offered by the claimant. The exhibit lettering was merely for administrative efficiency in returning exhibits to the proper parties. We will refer to the filed appraisal as the trial appraisal and the original appraisal as the pretrial appraisal. The pretrial appraisal presented a before value of $55,000 and an after value of $25,000. His direct damages were $300 and his consequential damages were $24,700. His trial appraisal presented a before value of $58,000 and an after value of $30,000. His direct damages were $500. He found a consequential damage of $27,500 but, on advice of the State’s counsel, he stated that these consequential damages were noncompensable. Claimant’s appraiser found a before value of $117,000 and an after value of $40,200. His direct damages were $762 which he rounded to $800 and his consequential damages were $76,000. We had thought that Priestly v. State of New York (23 N Y 2d 152) had finally allayed any dispute about the relationship and correlation of suitable access to highest and best use and compensable damage. Of course, the State’s trial appraisal was dated April, 1967 and the Priestly decision was rendered in 1968. In any event, the instant claim presents in crystal clear form the question of whether or not consequential damages sustained as a result of an appropriation, which changed the highest and best use of the property by leaving the remaining property with good physical access albeit access unsuitable for its previous highest and best use, are compensable consequential damages, or, damnum absque injuria. In our opinion, the cases clearly hold that suitability of access is directly related to the highest and best use of claimants’ property and that, when the highest and best use is changed as a result of the remaining access, any resulting consequential damages is a compensable damage. (See Priestly v. State of New York, 23 N Y 2d 152, supra; Argersinger v. State of New York, 32 A D 2d 708; Taylor v. State of New York, 32 A D 2d 884; King v. State of New York, 29 A D 2d 604; Laken Realty Co. v. State of New York, 29 A D 2d 1027, 1028; Red Apple Rest v. State of New York, 46 Misc 2d 623, 629, affd. *203 27 A D 2d 417.) As stated in the King decision (supra, p. 604): ‘ ‘ The appropriate rule, however, is set forth in the recent case of Red Apple Rest v. State of New York (27 A D 2d 417, 420): ‘ The question of whether or not suitable access has been left or provided is a question of fact which is related to the highest and best use of the property affected. (Holmes v. State of New York, 279 App. Div. 489.) ’ ”.
The State contends that the Priestly, King, and Laken decisions (supra) must be distinguished from the case at bar because they all involved circuity of access, whereas it did not. But that question was specifically dealt with in the Priestly decision and adversely to the State’s position herein. It was stated therein (pp. 156 and 157) that: “ therefore, a finding that a means of access is indeed circuitous does not eliminate the possibility that that same means of access might also be unsuitable in that it is inadequate to the access needs inherent in the highest and best use of the property involved. * * * unsuitability may well be superimposed upon what is undoubtedly circuitous access. # * * The evidence fairly compels the conclusion that the remaining access, coneededly circuitous, was also clearly unsuitable to the established highest and best use of residential development.” (Emphasis added.)
In face of the above, the State still urges that, as there was no circuity of access in the case at bar, and there was none, we are controlled by the decisions of Bopp v. State of New York (19 N Y 2d 368); Northern Lights Shopping Center v. State of New York (15 N Y 2d 688, cert. den. 382 U. S. 826) and, Red Apple Rest v. State of New York (27 A D 2d 417, supra); and must find a noncompensable consequential damage herein. However, both Northern Lights and Red Apple Rest involved impaired access without a change in the highest and, best use. The Bopp decision (supra), did contain some indications of a change in the effective highest and best use before the appropriation. However, the decision did not dwell on the highest and best use situation but related itself primarily to diversion of traffic, loss of view from the highway, and mere circuity of access, all of which are noncompensable under the legal maxim damnum absque mjuria. As stated in the Priestly decision (p. 155) : “ It is beyond dispute that mere circuity of access does not constitute a basis for an award of consequential damages (Bopp v. State of New York, 19 N Y 2d 368, 372; Selig v. State of New York, 10 NY 2d 34 * * *). But, this legal proposition is controlling in a particular case only if, as a question of fact, the access involved is shown to be merely circuitous * * *. If the facts established at the trial of a claim show that the access *204 involved is more than merely circuitous so that it can be characterized as ‘ unsuitable compensability follows. ’ ’
In our opinion, the developing case law clearly holds that circuity of access and/or impairment of access without a resulting change in highest and best use does not create a compensable consequential damage. However, circuity of access and/or impairment of access, which causes a change in the highest and best use, may create a compensable consequential damage. It is a question of fact to be determined on the evidence as to whether or not the access after an appropriation is suitably related to the pre-existing highest and best use. The fact that the access is physically suitable for utilization is not solely determinative of the issue of suitability. (Cf. Slepian v. State of New York, 48 Misc 2d 340, 342.)
The State’s brief also concerned itself with the power of the sovereign to restrict access to and from property adjacent to State highways. This regulatory power has been so clearly established as a valid exercise of the police power as to be beyond question. (Red Apple Rest v. McMorran, 12 N Y 2d 203; Northern Lights Shopping Center v. State of New York, 15 N Y 2d 688; Matter of Gerber v. McMorran, unreported, Sup. Ct., Westchester County, Sept. 30, 1966, affd. 28 A D 2d 646.) However, if in the exercise of its police power, the State appropriates land which adjoins the highway; and, if such appropriation completely destroys access or so impairs it as to change the existing land use to a less valuable use, then the State must respond in damages. To hold otherwise would be to permit a confiscatory use of the police power to regulate highway access. It should be noted, we have not included diversion of traffic in the above discussion. It has been so clearly established that damages caused by diversion of traffic are damnum absque injuria as to not require citation of authority.
Both appraisers agreed that the highest and best use of subject property was as a gasoline service station, plus, in claimant’s appraisal, an additional use for the easterly portion of land. At page 9 of the State’s trial appraisal, it was stated that: “ in the after taking situation, it would appear that the highest and best use for the subject property, rather than being for gas station usage with the entrances and exits near the traffic light, would be for some lesser use. # * * The appraiser finds that there will probably be a considerable loss in value to the property because of the appropriation. There is, in effect, a taking of approximately 300 feet of the frontage on the property by virtue of a nonaccess requirement in this area * * *. The appraiser finds that after conferences *205 with the attorney, that this taking probably constitutes a non-compensable damage. ’ ’
At page 24 of the State’s trial appraisal, it was further stated: “ The appraiser finds that there may even be a highest and best use change on the property because of the appropriation. The before taking situation would probably lend itself to a gas station site and after taking this would rather be impractical since the traffic pattern necessary for gas station usage would be difficult to obtain on this property after taking with the entrances located where they will have to be.”
In his pretrial appraisal, at page 24, the State appraiser wrote: ‘ ‘ Coming in a westerly direction on Route 6, any approaching motorists would be at a definite disadvantage since when they brake over the top of the hill, they will not have adequate sight pattern to forwarn them of the driveway. Prior to the appropriation, the property has approximately 564 feet along this road which gave motorists a good clear notice of the property and gave them ample time to pull in. This factor of access has been drastically diminished due to the appropriation and causes the property to suffer a loss in value due to the change in highest and best use. It will no longer be best utilized for gasoline service station purposes, rather, it will be best utilized for an automobile sales agency and repair shop. 1 ‘ The appraiser finds that the damage to the property will be a severance to the land value since it will no longer have this potential for gas station and will revert to some other lesser commercial use and therefore a decrease in the land value is evident.”
It is our opinion that the State appraiser’s statement in his pretrial appraisal was a more forthright, independent and accurate statement of the situation which actually existed at subject property, than was the somewhat equivocating appraisal statement contained in the trial appraisal. The credible evidence, and our view of the property, confirmed the claimant’s position that subject property had lost its before use as a gasoline service station. Admittedly, the State’s gas station “ expert ” advised us of one or two stations which were operated under conditions somewhat similar to these after conditions. We were not impressed or persuaded by this gentleman’s testimony. After this appropriation, an automobile driver seeking gasoline would have to drive onto the property and operate his vehicle approximately 250 to 350 feet down into a cul-de-sac; obtain gasoline; make a “ U ” turn and drive 250 to 350 feet back out of the cul-de-sac; and, then turn onto the highway. The credible evidence corroborated by common sense cogently estab *206 listed that this was not a gasoline service station site after the appropriation. It was stated in Priestly v. State of New York (23 N Y 2d 162, 156, supra): “Even the State’s expert on the State’s direct case found that there were substantial ($17,000) consequential damages flowing from the character of the only remaining access.” In the case at bar, the State appraiser on the State’s direct case found a $27,500 consequential damage 1 ‘ flowing from the character of the only remaining access.”
In valuing subject property, we believe the State appraiser was inordinately affected by the $55,000 purchase price paid for subject property. We consider ■ that claimant was a most knowledgeable buyer and, for reasons pointed out by claimant’s appraiser, made a most advantageous purchase. Our position is buttressed by the State’s appraisal. Claimant had, as set forth above, entered into an option to purchase claimant’s land both east and west of the access road to Eoute 22 for $85,000. This total sale covered an area of from 2 to 2.2 acres. The claimant allocated $55,000 to the east land and $30,000 to the west land. We do not believe its value allocations were frivolous but were predicated, among other things, on income tax consequences which it would have to face after a development and sale of said property. There was, incidentally, no knowledge on claimant’s part of the appropriation at the date of allocation. We believe, therefore, that this allocation of price was a fair division of the $85,000 total purchase price. The State trial appraisal in discussing the $30,000 west parcel, State Sale No. 1956, Exhibit “ K ” page 15, states: “ This sale, in the appraiser’s opinion, sold very low and the appraiser can find no reason for it.” Yet, in the same appraisal, this appraiser accepts the east parcel price of $55,000 as the fair market value of subject property on January 10, 1966. We find that both sales sold at a low figure and that the $85,000 was an excellent buyer’s price. We further find that time adjustments for subject property must be based on a sales date of September 9,1965, the date of the contract, Exhibit “ 6 ”. This was a binding and enforceable agreement on that date with a substantial down payment of $5,500.
We noted several statements in the State appraisal as to the increase in values in this area. One such is found on page 14 of Exhibit “ K ”: “ The appraiser has found from studying these sales and the economic situation in the immediate area of the subject property * * * that the land values in the area of the subject property are very explosive at the present time. That is to say, that they are climbing rapidly due to *207 their very desirable location for commerical use.” We noted that the State appraiser adjusted his comparable Sale No. 1957, sale of subject in 1965, at 5%% for his projected time differential of 15 months. Yet, he adjusted his comparable Sale No. 1958, directly across the highway from subject, 12% for a 16-month time differential; and, his comparable Sale No. 1956, parcel west of subject and directly adjacent to said access road, 16%% for a 16-month time differential. No viable reason was given for this great disparity in time differentials for properties not more than 200 feet apart. The State appraiser’s after comparable Sale No. 1962 was listed in his appraisal at 2.25± acres with 310.75± feet frontage along Route 6. Actually said comparable sale comprehended an area of about 37,000 square feet and had only 160.73± feet frontage on Route 6. See, Exhibit “28.” The State’s after comparable Sale No. 7133 was listed in the trial appraisal as December 31, 1965 and a time adjustment of $1,000 was made. Actually the sale took place on December 31, 1964. The State appraiser based a part of his valuation on the front foot values of various com-parables. However, when he considered said frontage, he did not differentiate between effective front footage and unuseable front footage.
The claimant’s appraiser presented a square foot before value for his gas station area of 24,729± square feet of $90,000; or, $3.63 a .square foot. His Sales 1 to 8, inclusive, were, in our opinion, overadjusted to develop an unrealistically high figure for the gasoline service station portion of this land. He relied primarily on his Sale No. 1, across Route 6 from subject, for his before square foot value of $3.63. This sale he adjusted 45% which is an acceptable percentage, although approaching the outer limits or respectability. His other sales were adjusted from 60% to 225%, except for one sale at a 5% net adjustment. We have considered all of the gasoline service station sales presented, with particular reliance on claimant’s Sale No. 1 (State Sale No. 1958); claimant’s Sale No. 2 (State’s Sale No. 1955); State Sale No. 1957 (with the caveat expressed above about the favorable buyer price for the property); and, claimant’s Sale No. 3. We have also considered the gasoline service station leases presented by claimant with particular emphasis on Lease No. 12. We have also, of course, considered the claimant’s sales related to a before general highway commercial value for subject’s easterly land area.
We find a before value for 24,730± square feet of gasoline service station land of $71,700; a before value of $16,000 for *208 20,000± square feet of general highway commercial land; and, we accept claimant’s before value of $7,000 for building improvements; or, a total before value of $94,700.
We have considered all of the comparable sales offered relative to a general highway commercial use after the appropriation. We have also considered the after sale of the remaining property to a Mr. Sullivan for $45,000. We noted that claimant had to accept a second mortgage of $10,000 as part of the $45,000 purchase price. We do not find a consequential damage to the remaining acreage as it relates to the general highway commercial use lesser in quality than a gasoline service station use. We find an after land value of $35,500 and a building value of $7,000; or, a total after value of $42,500. Our after value is $2,300 greater than the claimant’s after value and $12,500 greater than the State’s after value. However, we believe our land and building values are within the component values presented to us and are also within the perimeters established by the testimony and exhibits received in evidence.
Claimant has been damaged in the sum of $52,200 of which $600 was direct damage and $51,600 was consequential damage.
The claimant is awarded the sum of $52,200 for all damages direct and consequential, with interest thereon from April 26, 1967 to the date of entry of judgment herein.